1

2                    **UNITED STATES DISTRICT COURT**

3                        **DISTRICT OF OREGON**

4                        **PORTLAND DIVISION**

5

6  UNITED STATES OF AMERICA, for      )
   the use and benefit of TBH &       )
7  ASSOCIATES, LLC, a Washington      )        No. 12-cv-00133-HU
   limited liability company,         )
8                                     )
                    Plaintiff,        )
9                                     )    **ORDER ON DEFENDANTS' MOTION**
   vs.                                )    **FOR PARTIAL SUMMARY JUDGMENT**
10                                    )
   WILSON CONSTRUCTION CO., an        )
11 Oregon corporation; and WESTERN    )
   SURETY COMPANY, a South Dakota     )
12 corporation;                       )
                                      )
13                  Defendants.       )
                    _____

14

15

16

17 Joseph A. Tripi
   The Law office of Joseph A. Tripi, P.C.
18 806 SW Broadway Avenue, Suite 800
   Portland, OR 87205
19
            Attorney for Plaintiff
20

21

22 Paul C. Berg
   David P. Morrison
23 Cosgrave Vergeer Kester LLP
   888 SW Fifth Avenue, Suite 500
24 Portland, OR 97204

25          Attorneys for Defendants

26

27

28

1 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

HUBEL, Magistrate Judge:

This contract dispute relates to construction of the McNary-John Day Transmission Line (the "Project") by the Bonneville Power Administration ("BPA"). The defendant Wilson Construction Co. was general contractor for the Project. The defendant Western Surety Company issued a surety bond for Wilson relating to the Project. (The defendants are referred to collectively herein as "Wilson.") TBH & Associates ("TBH") was a subcontractor of Wilson's for purposes of "preparing foundations and footings for the transmission towers on both Phase I and Phase II of the Project." Dkt. #36, p. 1. TBH alleges Wilson failed to pay certain sums owed to TBH for work performed on Phase II of the Project. *See* Dkt. #1.

The case is before the court on Wilson's motion for partial summary judgment. Dkt. #45. Wilson seeks a judgment that it is not liable for amounts TBH claims it is owed under Change Orders 8, 14, 15, and 16, and summary judgment dismissing TBH's *quantum meruit* claim. *Id.* The motion is fully briefed. The court heard oral argument on the motion on June 13, 2013.

### SUMMARY JUDGMENT STANDARDS

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In considering a motion for summary judgment, the court "must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial." *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002)

1  (citing *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th
2  Cir. 1996)).

3      The Ninth Circuit Court of Appeals has described "the shifting
4  burden of proof governing motions for summary judgment" as follows:

> 5      The moving party initially bears the burden of
> 6  proving the absence of a genuine issue of
>    material fact. *Celotex Corp. v. Catrett*, 477
> 7  U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d
>    265 (1986).  Where the non-moving party bears
> 8  the burden of proof at trial, the moving party
>    need only prove that there is an absence of
>    evidence to support the non-moving party's
> 9  case. *Id.* at 325, 106 S. Ct. 2548.  Where the
>    moving party meets that burden, the burden
> 10  then shifts to the non-moving party to desig-
>    nate specific facts demonstrating the exis-
> 11  tence of genuine issues for trial.  *Id.* at
>    324, 106 S. Ct. 2548.  This burden is not a
> 12  light one.  The non-moving party must show
>    more than the mere existence of a scintilla of
> 13  evidence. *Anderson v. Liberty Lobby, Inc.*,
>    477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed.
> 14  2d 202 (1986).  The non-moving party must do
>    more than show there is some "metaphysical
> 15  doubt" as to the material facts at issue.
>    *Matsushita Elec. Indus. Co., Ltd. v. Zenith*
> 16  *Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct.
>    1348, 89 L. Ed. 2d 528 (1986).  In fact, the
> 17  non-moving party must come forth with evidence
>    from which a jury could reasonably render a
> 18  verdict in the non-moving party's favor.
>    *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505. In
> 19  determining whether a jury could reasonably
>    render a verdict in the non-moving party's
> 20  favor, all justifiable inferences are to be
>    drawn in its favor.  *Id.* at 255, 106 S. Ct.
> 21  2505.

22  *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th
23  Cir. 2010).

24

25                          ***CHOICE OF LAW***

26      Portions of Wilson's motion for partial summary judgment
27  require examination of the language of the contract between TBH and
28  Wilson.  The prime contract between Wilson and BPA is governed by

3 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1  federal contract law, which applies traditional common law

2  principles. *See, e.g., Minidoka Irr. Dist. v. U.S. Dept. of*

3  *Interior*, 154 F.3d 924, 926 (9th Cir. 1998) (citing *First*

4  *Interstate Bank v. S.B.A.*, 868 F.2d 340, 343 n.2 (9th Cir. 1989)*)*;

5  *Sam Macri & Sons, Inc. v. U.S. ex rel. Oaks Constr. Co.*, 313 F.2d

6  119, 124 n.1 (1963) (citing, *inter alia*, *Ivanhoe Irr. Dist. v.*

7  *McCracken*, 357 U.S. 275, 289, 78 S. Ct. 1174, 1182, 2 L. Ed. 2d

8  1313 (1958)).

9      However, "a subcontract, being between private parties, is

10 governed by state law[.]" *Sam Macri & Sons*, 313 F.2d at 124 n.1.

11 But which state's law should the court apply?  TBH is a Washington

12 corporation, while Wilson is an Oregon corporation. *See* Dkt. #1,

13 ¶¶ 2 & 3.  The Project ran from BPA's McNary Substation in Oregon,

14 across the Columbia River, and ending at BPA's John Day Substation

15 in Washington.  The subcontract between TBH and Wilson does not

16 appear to contain a choice-of-law provision, and is not clear from

17 the subcontract, which only specifies "Segment Miles 42-79,"

18 whether TBH's work was performed only in Oregon, only in Washing-

19 ton, or in both states. *See* Dkt. #47-1, the Subcontract.

20     Judge Anna Brown of this court explained how the court

21 approaches this type of choice-of-law issue in *Home Poker*

22 *Unlimited, Inc. v. Cooper*, 2009 WL 5066653 (D. Or. Dec. 15, 2009):

23          "When a federal court sitting in diver-
            sity hears state law claims, the conflicts
24          laws of the forum state are used to determine
            which state's substantive law applies." *389*
25          *Orange St. Partners v. Arnold*, 179 F.3d 656,
            661 (9th Cir. 1999).  Under Oregon conflict-
26          of-law rules, the Court must determine as a
            threshold issue whether there is a material
27          difference between Oregon substantive law and
            the law of the other forum. *Waller v. Auto-*
28          *Owners Ins. Co.*, 174 Or. App. 471, 475 (2001).

> If there is a material difference, the Court must determine whether both states have substantial interests in having their laws applied. *Pulido v. United States Parcel Serv. Gen. Servs. Co.*, 31 F. Supp. 2d 809, 813 (D. Or. 1998) (citing *Dabbs v. Silver Eagle Mfg. Co.*, 98 Or. App. 581, 583-84 (1989)). Finally, if "both states have substantial interests, the Oregon Supreme Court has adopted the 'most significant relationship' approach of the Restatement (Second) Conflict of Laws." *Id.* (citation omitted).

*Home Poker*, 2009 WL 5066653, at *3; *see Spirit Partners, LP v. Stoel Rives LLP*, 212 Or. App. 295, 301, 157 P.3d 1194, 1198 (2007) ("The threshold question in a choice-of-law problem is whether the laws of the different states actually conflict."). If there is no material difference between the law of the forum state - here, Oregon - and the substantive law of the other state in question - here, Washington - then the law of the forum state applies. *See Angelini v. Delaney*, 156 Or. App. 293, 300, 966 P.2d 223, 227 (1998) (citations omitted). If a party proposes application of the law of a state other than the forum state, then that party must identify material differences between the law of the forum state and the law of the other forum. *See Spirit Partners*, 212 Or. App. at 301, 157 P.3d at 1198.

In the present case, neither party argues Washington law should be applied. Wilson simply declares that Oregon law controls TBH's breach-of-contract claim, Dkt. #36, p. 7, and TBH apparently agrees, citing Oregon case law in support of its arguments, *see* Dkt. #53, p. 10. The Oregon and Washington courts approach contract interpretation somewhat differently.

In Oregon, the court first looks to see if the language of the contract is clear on its face, considering both the text in

5 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1  question and its context within the contract.  If so, then no
2  further analysis is needed.  *See Yogman v. Parrott*, 325 Or. 358,
3  361, 937 P.2d 1019, 1021 (1997).  If the contract provision at
4  issue is ambiguous, then the court examines extrinsic evidence of
5  the parties' intent.  *Id.*, 325 Or. at 363, 937 P.2d at 1022.  In
6  the absence of extrinsic evidence of intent, the court turns to
7  basic common-law tenets of contract construction.  *Id.*

8      Washington courts take the view that "the meaning of a writing
9  can almost never be plain except in a context."  *Hearst Comms.,*
10 *Inc. v. Seattle Times Co.*, 154 Wash. 2d 493, 502, 115 P.3d 262, 266
11 (2005) (internal quotation marks, citations omitted).  Thus, in
12 Washington, the court may consider *ab initio* the representations
13 made and circumstances surrounding execution of the contract, the
14 parties' subsequent conduct and course of dealing, usages of trade,
15 and other extrinsic evidence, but only "to determine the meaning of
16 *specific words and terms used* and not to show an intention
17 independent of the instrument or to vary, contradict or modify the
18 written word."  *Id.*, 154 Wash. at 503, 115 P.3d at 267 (emphasis in
19 original; internal quotation marks, citations omitted); *Spectrum*
20 *Glass Co. v. Public Utility Dist. No. 1 of Snohomish Cty*, 129 Wash.
21 App. 303, 311, 119 P.3d 854, 858 (2005).  "Such evidence is
22 admissible regardless of whether the contract language is deemed
23 ambiguous."  *Spectrum Glass*, 129 Wash. App. at 311, 119 P.3d at 858.
24 Nevertheless, Washington courts still focus on the language of the
25 contract itself, "follow[ing] the objective manifestation theory of
26 contracts . . ., [and] attempt[ing] to determine the parties'
27 intent by focusing on the objective manifestations of the agree-
28 ment, rather than on the expressed subjective intent of the

6 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

parties."   *Id.*   "[T]he subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used. . . .  We do not interpret what was intended to be written but what was written."  *Id.*, 154 Wash. at 504, 115 P.3d at 267 (citations omitted).

Importantly, if interpretation of the contract does not depend upon extrinsic evidence, or if "the extrinsic evidence leads to only one reasonable inference," then interpretation of the contract provision at issue is a matter of law that properly can be decided on summary judgment.  *Kidder Mathews & Segner, Inc. v. Harbor Marine Maint. & Supply, Inc.*, 2013 WL 1337626, at *4 (citations omitted).

The court finds the Oregon and Washington approaches, though somewhat different, ultimately would reach similar results.  In both states, the courts first will look to the language of the contract itself.  Although, in Washington, the parties may offer extrinsic evidence to place the contract in context, and to assist the court in determining the meanings of particular words or phrases, such evidence is not accepted for purposes of contra-dicting the express language of the contract.  The courts of both states will examine extrinsic evidence of the parties' intent to interpret an ambiguous contract provision.  Thus, the court finds no material differences between the relevant laws of Oregon and Washington, and will apply Oregon law to interpret the subcontract between TBH and Wilson.

/ / /

/ / /

/ / /

7 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1                          *DISCUSSION*

2                       *Factual Background*

3       As noted above, this lawsuit concerns a dispute over payment

4  for TBH's work on Phase II of the Project.  The Project was

5  constructed in two phases, each of which involved the construction

6  of approximately 180 towers and 720 footings.  TBH's work on Phase

7  II involved "preparing foundations and footings for electrical

8  transmission towers from mile 42 to 79[.]" Dkt. #46, p. 2 (citing

9  Dkt. #47-1, Agreement No. 5376SC-TBH-2, p. 1).  Wilson describes

10 the work as follows:

11              Each tower required four separate footings –
                one for each leg of the tower.  The various
12              types of footings used during Phase II
                included concrete shafts, grillages, and
13              plates.  As the name suggests, concrete shaft
                footings consist of a cylindrical shaft of
14              concrete poured into the earth to a specified
                depth.  Grillage and plate footings are dif-
15              ferent.  Instead of augering a cylindrical
                hole with a drill, an excavator is used to dig
16              a rectangular hole to accommodate either a
                steel plate or a grill which acts as the
17              foundation for the tower.

18 Dkt. #46, p. 2.

19      In his deposition, Peter Tapio, TBH's "Managing Member and

20 President," testified TBH agreed to be paid by the lineal foot for

21 the drilling of concrete shafts.  For those locations requiring

22 grillage or plate footings, TBH looked at the foundation detail

23 that was available for each tower location, calculated the excava-

24 tion required, and then set a fixed per-unit price for each plate

25 and each grillage footing based on those calculations.  TBH's

26 calculations were made based on information TBH had in January

27 2010, months five or six months prior to "the official release of

28 Phase 2." Dkt. #48-1, pp. 4-8, Tapio Depo. at 100, 125, & 225-26.

8 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

According to Tapio, the geological characteristics of the terrain for the two phases of the Project differed considerably. Phase I was located "in the vicinity of Plymouth, WA, from Mile 2 and proceeded west to Mile 42." Dkt. #55, Tapio Decl., ¶ 5. The terrain on the Phase I site was fairly consistent geologically, comprised of flat, sandy gravels and cobbles over rock. *Id.* Phase II was located "approximately 15 miles east of Roosevelt, WA, proceeding west from about Mile 42 to Mile 79[.]" *Id.* The geological characteristics of the terrain on Phase II "varied dramatically from flat to steep," and ranging "from basalt to basalt flows overlaid with soil to cemented sands, gravels, cobbles and areas of high groundwater. Phase II subsurface conditions were complex." *Id.*

TBH and Wilson entered into a fixed-price subcontract (the "Subcontract") dated June 1, 2009, setting forth the terms and conditions of TBH's work on Phase II. Dkt. #47-1, Subcontract. The Subcontract required TBH to "furnish all labor, transportation, supervision, equipment and materials necessary for Phase II Foundation Work Segment Miles 42-79, Materials Management and Pad Construction per the plans and specifications." *Id.*, p. 1. Under the terms of the Subcontract, TBH was expressly responsible for:

- Assembly and delivery to tower sites of all BPA provided footing parts. Offloading, receiving, inspection, inventory, storage and security by others.
- Staking of footings from BPA control points at each footing
- Reinforcing steel, miscellaneous metal, concrete, grout and sand bedding
- Drilling for deformed bars on rock footings (grouted type)
- Planning for structural excavation, shoring, dewatering, backfill and removal of spoils. Dust control and management of site conditions.

9 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1      •     Access pads from BPA built road

2 *Id.*   Expressly not included under the Subcontract were:

3      •     Access road construction
     •     All blasting and associated work
4      •     All work specified and incidental to the Mitigation
         Implementation Table
5      •     Vehicle Wash Stations and operation of the same
     •     All site, crop and land owner restoration
6      •     Premium costs of BPA inspection outside the
         specified work hours
7      •     All costs of bonds, testing, inspections, certifi-
         cations and warranties

8

9 *Id.*, pp. 1-2.

10      Under the terms of the Subcontract, TBH also agreed to "comply

11 fully with all provisions of the Prime Contract" between Wilson and

12 BPA. *Id.*, p. 3 ¶ 1. The Subcontract also set out procedures for

13 Wilson to make changes to the work to be performed by TBH. *See*

14 *id.*, pp. 3-4 ¶ 12.

15      BPA Supplemental Technical Specification for the Project,

16 dated March 23, 2009, provided, among other things, that BPA had

17 "conducted a field geotechnical investigation." Dkt. #55-1, p. 4,

18 § 01.01.08 "Geotechnical Report." Under "Report Detail," the

19 Specification provided as follows:

20      1.    BPA conducted a Geotechnical reconnaissance
         and created a report to (a) characterize
21          existing surface conditions at each proposed
         structure site and (b) develop preliminary
22          foundation recommendations. The reports are
         attached in the Construction Data.
23

24      2.    Once the environmental clearance and protocol
         for cultural monitoring is established, BPA
25          will conduct a geotechnical field study to
         obtain additional information on subsurface
26          conditions. The results of that study will be
         made available to [Wilson].

27 *Id.*

28

10 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1    BPA never made the geotechnical field study specified in
2  subparagraph 2, quoted above - a fact TBH maintains is critical to
3  its claims in this lawsuit.  Dkt. #55, Tapio Decl., ¶ 7.   TBH
4  claims that instead, Wilson decided to proceed "on an 'ad hoc' site
5  to site basis using its blasting subcontractor Ryno Works Inc.
6  ('Ryno') to provide test drilling with a blast hole drill machine."
7  Dkt. #53, p. 4; Dkt. #55, Tapio Decl., ¶ 17.  TBH's representation
8  is consistent with the deposition testimony of BPA's engineers on
9  the Project.  *See, e.g.*, Dkt. #54-5, pp. 2-3 Deposition of Shantini
10 Ratnathicam (BPA's Construction Manager on the Project) at 53-54
11 (stating because "Wilson had proposed that they were going to go
12 and first drill holes and blast ahead," BPA would not be doing any
13 more geotechnical field studies).

14    Kerry Cook, a geotechnical engineer for BPA on the Project,
15 testified there actually were two reasons that no geotechnical
16 investigation was performed prior to the commencement of work.  As
17 provided in subparagraph 2, quoted above, the geotechnical field
18 study was to be obtained after "the environmental clearance and
19 protocol for cultural monitoring" had been established.  Cook
20 testified:

> [BPA] would have liked to do a more detailed
> geotech investigation, but because of environ-
> mental constraints, we weren't allowed to go
> out and do any soil disturbing activities
> until the environmental document was com-
> pleted. . . .  So all I could do was do a
> surface recon, . . . and that gave us the best
> information available for the foundation
> designs, but with the caveat that they were
> preliminary designs subject to change as we
> didn't know the full extent of the subsurface
> conditions.
>
> *    *    *

11 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

> [However,] [t]he timing of the environmental
> document occurred shortly before the issue to
> proceed was given to Wilson, so there wasn't
> time in between there to do the geotech
> investigation.  In addition, Wilson proposed
> to go in advance of the footing excavation
> crews and do their own investigation to
> determine depth of rock, and that would pro-
> vide good information to verify the foundation
> designs and give us a little bit of time to
> change any foundations if we needed to.  So we
> decided that was a good approach, and we did
> not do the full geotech investigation that we
> had planned.
>
> *    *    *
>
> What Wilson had proposed is to go ahead with
> the crew with the air track drill and drill
> each footing location and determine the depth
> of rock at each footing.  And that would
> probably give a bit more information than,
> say, a boring would.  We wouldn't necessarily
> drill a boring at each footing, maybe near the
> center of the tower, and have that boring be
> representative of all four footings.  So in
> some ways the air track drill gave more
> detailed information of the depth of rock at
> each footing location.

Dkt. #54-1, pp. 2-4, Cook Depo. at 13-19.

Cook indicated that to his knowledge, when it was determined BPA would not provide a geotechnical field study, that decision was not documented anywhere, and there was no addendum to BPA's contract with Wilson. *Id.*, p. 4, Cook Depo. at 19. The decision was made jointly by Cook and "the project manager Teresa Berry." *Id.*, Cook Depo. at 20. TBH could not begin construction on a shaft until BPA finalized its design, which was done when Wilson provided the depth of rock. Dkt. #54-5, pp. 5, 6, Ratnathicam Depo. at 60, 62. TBH claims that due to this procedure, it could not know certain information regarding the job in advance, including (1) which locations would require drilled shafts (as opposed to grillage and plate footings), and the length of those shafts; (2)

12 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

composition of the subsurface conditions, such as thickness and depth of rock; and (3) percentage of rock and soil at each location. Dkt. #53, p. 4; *see* Dkt. #55, Tapio Decl., ¶¶ 11, 14 & 15. TBH claims the blast hole drill machine used by Ryno did not provide adequate information regarding subsurface conditions, so that TBH did not know the actual site conditions until it began drilling or excavating at a particular location. *Id.*, p. 5 (citing Dk. #54-1, pp. 3-6 & 8, Cook Depo. at 17-18, 28, 36 & 73; Dkt. #54-5, p. 3, Ratnathicam Depo at 54; Dkt. #54-7, p. 3, Streetman Depo. at 36 (David Streetman was Wilson's contracting officer on the Project); Dkt. #55, Tapio Decl., ¶ 17).

Cook testified that a drilled shaft design requires "a very detailed, precise blasting plan, and the conditions of the rock might impact that design." Dkt. #54-1, p. 5, Cook Depo at 28. Cook agreed that Ryno's blasting plan for drilled shafts would have been more precise with a geotechnical field study, rather than just depth of rock. *Id.* Cook testified the contract between BPA and Wilson was designed with some flexibility to account for different types of conditions:

> The bid quantities in the contract were set up specifically for different types of foundations. We had to bid items for grillage footings, plate footings, drilled shaft in soil and drilled shafts in rock conditions and the different diameters of drilled shafts. We specifically set up all those individual items to adjust the compensation where we changed the foundation type or diameter.

*Id.*, p. 7, Cook Depo. at 39. Cook indicated BPA initially provided reconnaissance information regarding the tower locations, and "the depth of rock was estimated based on that surface reconnoissance [sic]. So it was anticipated that there could be conditions where

13 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1  that depth of rock that we anticipated based on that surface

2  reconnoissance [sic] could vary significantly and require us to

3  change the foundations." *Id.*, Cook Depo. at 39-40.

### Change Order 8

6      The first change order at issue in Wilson's motion is Change

7  Order 8 (COP8)[1], which relates to the footings for tower 59/4.

8  Wilson describes the events that resulted in COP8 as follows:

> Plans called for tower 59/4 to be erected
> on concrete shaft footings.  [TBH] began work
> on legs one and four of tower 59/4, but
> experienced caving of dirt and rock as [TBH]
> augered the holes with a drill.  A BPA geo-
> technical engineer visited the site on
> September 9, 2012, to determine the cause of
> the caving and concluded that [TBH's] diffi-
> culties were self-inflicted due to its failure
> to use casing (cylindrical shoring) to prevent
> caving, contrary to [TBH's] own agreed-upon
> work practices which stated that [TBH] would
> "install temporary casing and advance the
> casing through the drilling operation as
> necessary to prevent caving" and would then
> remove the casing by crane.  BPA decided to
> change the foundations to grillages because
> plaintiff admitted it didn't have the casing,
> nor the crane, necessary to sufficiently case
> the holes to prevent caving.

20  Dkt. #46, p. 3 (citations omitted).  In support of the above-quoted

21  description, Wilson repeatedly cites Peter Tapio's deposition at

22  page 172, lines 1-19, as well as Exhibit 8 to the Tapio deposition.

23  *See id.*, pp. 3-4.  Tapio's deposition testimony confirms that (a)

_____

25      [1]TBH refers to change orders between TBH and Wilson with a
"COP" number; for example, it refers to Change Order No. 8 as
26  "COP8."  *See* Dkt. #53, pp. 5 & 10.  TBH indicates the corresponding
change orders between Wilson and BPA were designated with a "CCR"
27  number; for example, Change Order No. 1 is referred to as "CCR15B.
*Id.*, p. 5.  For purposes of this order, the court adopts TBH's
28  method of designating the change orders.

14 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 8 "represents the summary of [TBH's] claim for change order number 8 and the backup related to it"; (b) COP8 related to work at tower 59/4; and (c) the original plan for the footing of tower 59/4 called for a shaft foundation. *See* Dkt. #48-1, p. 9, Tapio Depo. at 172. However, nothing in Tapio's deposition testimony supports Wilson's representation that the change from a shaft foundation to grillages was due to TBH's "self-inflicted" difficulties.

Tapio Deposition Exhibit 8, and the parties' supplemental briefing, provide more detailed information regarding the events leading to COP8. The parties agree that on or about August 25, 2010, TBH submitted to Wilson a Drilled Shaft Installation Plan ("DSIP"). *See* Dkt. #68-6, Tapio Suppl. Decl. Ex. 6, p. 3 (e-mail to Streetman attaching the DSIP). The DSIP was forwarded to Wilson on August 27, 2010. *See* Dkt. #66, Streetman 2nd Suppl. Decl., ¶ 6 & Ex. 4. Among other things, the DSIP indicated TBH would "Install temporary casing and advance the casing through the drilling operation as necessary to prevent caving," and "Once the concrete has been placed, the casing will be removed by the crane." Dkt. #66-4, Streetman 2nd Suppl. Decl. Ex.4, p. 1. The DSIP further specified that TBH "anticipate[d] the use of temporary casing." *Id.*, p. 2.

Upon review of the DSIP, Cook sent an e-mail to Ratnathicam on August 27, 2010, indicating that the procedure outlined in the DSIP was "representative of the installation that [he] observed." Dkt. #68-6, Tapio Suppl. Decl. Ex. 6, p. 2. However, Cook noted the Ryno blast plan "should be included or referenced" in the DSIP, because the DSIP failed to "mention the pre-blasting to loosen the rock prior to drilling." *Id.*

15 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1    TBH began work at tower 59/4 on August 31, 2010.  That day,

2 BPA inspectors visited the job site at tower 59/4.  The job diary

3 for that date contains the following note:

> Shft. Ftg. No. 4 was initially drilled with
> 4 ft. diameter auger down to 8 ft. when cave-
> ins activated creating approximately 14 ft.
> circumferential bell around the top.  Drilled
> foundation was backfilled and set a 7 ft.
> diameter Corrugated Metal Pipe (CMP), encased
> with 4 [cubic yards] of structural concrete to
> lock the CMP in place[].   The intent is to
> prevent further cave-ins and minimize the
> volume of concrete to be poured. . . .  Note:
> CMP is not to exceed 10 ft. in depth - in
> order not to reduce the "Frictional Resis-
> tance" (Skin Friction) of the Uplift Force as
> structurally designed.

12 Dkt. #48-1, p. 19.  Drilling continued on September 3, 2010, when

13 the following was noted in the job diary:

> Crew resumed drilling on Shft. Ftg. No. 4 from
> 6 ft. diameter auger, down to 6 feet to 6 ft.
> diameter auger down to 10 ft. when cave-ins
> took place disturbing the installed 7 ft.
> diameter x 4 ft. long CMP (Corrugated Metal
> Pipe) together with the concrete encasement.
> Crew terminated the drilling activities due to
> potential danger and the construction of being
> not cost-effective.  The plan is to backfill
> the drilled foundation with CDF . . . and to
> be re-drilled.  Also, . . . [illegible] the
> possibility of installing CMP, a minimum of
> 6 ft. and a maximum of 10 ft. as a directive
> from Dan Holzer (Sr. BPA Inspector).   The
> principle is about maintaining the "Uplift
> Frictional Resistance of the Shaft's Skin
> Friction". . . .  Open drilled foundations
> were fenced-off and covered with tubular pipe
> panels enclosed with cyclone wires for safety
> compliance.

25 *Id.*, p. 25.

26    On Tuesday, September 7, 2010, Streetman sent a "high impor-

27 tance" e-mail to Ratnathicam, asking Ratnathicam to review TBH's

28 request for information ("RFI").  TBH was requesting approval for

16 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1 "a low density concrete mix," and had scheduled the work for the
2 next morning.  *Id.*, p. 64.  Ratnathicam responded, "After the
3 telephone conference yesterday and site inspection by our geotech-
4 nical engineer today, it was decided that grillage footings will be
5 the best option for this site.  Refer to CCR #68, that changed THE
6 SHAFT FOOTINGS TO GRILLAGES."  *Id.*  On Wednesday, September 8,
7 2010, "[d]ue to excessive cave-ins," the drilled shaft was back-
8 filled and encased with CMP. "Soil Mec broke down @ approximately
9 10:30 am; drilling activities [were] terminated and will resume
10 next Wednesday when the replacement will be available."  *Id.*,
11 p. 27.

12     On September 9, 2010, BPA's Construction Manager Ratnathicam
13 sent an e-mail to several individuals at Wilson, stating as
14 follows:

15            This is to confirm that all four footings at
               59/4 have been changed to grillages after a
16            site visit by our geotechnical engineer this
               morning.  The fractured rock found at this
17            location is not suitable for the 20 ft deep
               shafts that were planned for this location
18            based on reported rock depth of 4-6 ft. . . .
               Submit a price proposal within 4 weeks to make
19            an equitable adjustment for this change.

20 *Id.*, p. 15.

21     The same day, David M. Hesse e-mailed Ratnathicam listing five
22 "comments concerning the [DSIP]."  Dkt. #68-6, Tapio Suppl. Decl.
23 Ex. 6, p. 2.  Shantini then e-mailed Streetman directing him to
24 resubmit a DSIP that addressed Hesse's questions.  *Id.*

25     TBH prepared an Extra Work Order Report dated September 9,
26 2010, relating to "Structure 59/4 - change order from drilled
27 concrete pier to grillage."  Dkt. #48-1, p. 28.  TBH sent Wilson a
28 Proposal for Additional Work dated September 21, 2010, relating to

17 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1 changes in "the design of structure 59/4 from a drilled concrete
2 pier foundation to a grillage foundation." *Id.*, p. 29.

3      When TBH's proposal was submitted to BPA, Kerry Cook and
4 Shantini Ratnathicam discussed the proposal by e-mail. Ratnathicam
5 stated, "The only thing we can pay for is the footing installation.
6 We pay for what they installed and we already have a price per
7 footing." She invited the BPA "team" to comment. *Id.*, p. 14.
8 Cook responded as follows:

> The reason I recommended that we change to
> grillage at this structure is the TBH drilling
> Forman [sic] told me he could not place and
> retrieve a temporary casing with the equipment
> he had available. This was not consistent
> with their approved proposal for placing
> temporary casing in caving conditions, as
> stated in their drilled shaft installation
> plan[.] . . . TBH construction practice at
> leg #4 (which had caved) was to stabilize the
> drilled hole with lean concrete and redrill.
> Since this was not what they had proposed in
> caving conditions, and the lean concrete
> required at the four holes could potentially
> become a large additional expense, I recom-
> mended the grillage footings. There was no
> discussion at that time that BPA would pay for
> the work that TBH could not complete as they
> had proposed under caving conditions. In my
> opinion, TBH should not be compensated for
> work they could not complete as they had
> proposed.

21 *Id.*

22      Ratnathicam communicated to David Streetman (Wilson's
23 contracting officer) that BPA had rejected TBH's price proposal,
24 explaining BPA's reasoning, in part, as follows:

> The question appears to be that TBH had
> drilled leg #4 and part of leg #1, before we
> changed the footing type to grillage. As I
> said before, Wilson needs to settle this with
> their subs depending on their contracts with
> each subcontractor involved with Item 3.1
> pricing. . . . I think BPA should not be held

18 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

```
              responsible for cost over run due to ineffec-
              tive construction practices.  After all the
              total bid price for one 20 ft shaft of this
              type in soil was only about 10K which included
              all the concrete and rebar (up to 5K more if
              it were in solid rock).  So the attached claim
              by TBH for 30 K seems excessive.
```

*Id.*, pp. 13-14.

In Tapio's declaration, Dkt. #55, he states TBH initially proceeded on structure 59/4 in the same manner it had proceeded on six previous structures throughout the Project.  According to Tapio, "BPA and Wilson Construction incorrectly categorized the geology.  Depth to rock was reported to be 4 to 6 feet below ground surface[] per Ryno's data."  Dkt. #55, ¶ 25.  TBH relied on the data, and therefore did not anticipate the "need to provide temporary casing Wilson alleges was required."  *Id.*  In addition, as indicated in the quoted Project notes above, "TBH was instructed by BPA not to use temporary casing beyond ten feet."  *Id.*, ¶ 26 (citing Dkt. #48-1, pp. 69 & 75).  According to TBH, the four-foot corrugated metal pipe (CMP) would have been adequate for a depth to rock of 4 to 6 feet, as had been reported.  TBH maintains 59/4 "was never suitable for a [d]rilled shaft[, and] . . . Wilson's information was not accurate."  *Id.*, ¶ 25.  According to Tapio, "BPA's claim that TBH failed to use proper[] techniques or follow its drilled shaft plan is contrary to their own instructions; and, past performance."  *Id.*, ¶ 26.

To summarize, the evidence shows TBH began drilling the footing at structure 59/4, but encountered cave-ins, ultimately resulting in a change order from drilled footings to grillages. The parties dispute the reason for the cave-ins and the reason the change to grillages was necessary.  TBH claims it is owed

19 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1  additional sums arising from the change, while Wilson argues the
2  additional costs TBH incurred were due to its own errors.   The
3  parties also disagree regarding whether TBH's DSIP submitted on
4  August 25, 2010, was a controlling contractual document.   The e-
5  mail chain discussed above suggests the DSIP had not been approved
6  at the time TBH began working on tower 59/4.   However, BPA quoted
7  from that version of the DSIP in rejecting TBH's request for more
8  money.   Thus, the evidence clearly demonstrate a genuine dispute as
9  to the material facts underlying this claim.

10      However, even though Wilson maintains COP8 was required due to
11  TBH's own actions, Wilson does not base its summary judgment motion
12  on the facts.   Instead, Wilson bases its motion on procedural
13  language in the Subcontract.   The Subcontract sets forth limita-
14  tions on what TBH can recover for changes made by BPA to the work
15  to be performed by TBH:

> With regard to changes made by [BPA] (includ-
> ing suspension of work or price adjustment due
> to increase or decrease of quantities or
> otherwise), the adjustment of [TBH's] compen-
> sation or time shall be commensurate to the
> increase or decrease in [Wilson's] compensa-
> tion or time, insofar as the changes relate to
> [TBH's] work.   [TBH] agrees to accept the
> adjustment in compensation or time finally
> allowed by [BPA] on account of such changes
> insofar as they relate to [TBH's] work, and
> [TBH] shall have no right against [Wilson] for
> such changes beyond the rights that [Wilson]
> is able to enforce against [BPA].   [TBH] shall
> pay all reasonable costs of prosecuting and
> collecting claims against [BPA] on behalf of
> [TBH].

25  Dkt. #47-1, pp. 4-5, Subcontract, ¶ 12.   Wilson argues BPA rejected
26  COP8 submitted by TBH, and despite having the contractual right to
27  do so, TBH did not appeal BPA's decision.   Wilson claims TBH
28  "cannot present any evidence from which a reasonable juror could

20 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

conclude that Wilson was able to recover anything from BPA as a result of the changes that gave rise to [TBH's] Change Order No. 8." Dkt. #46, p. 9. Because the Subcontract limits TBH's compensation to the amount Wilson is able to collect from BPA, and because BPA rejected COP8, Wilson argues TBH has no right to collect the amounts claimed in COP8 from Wilson. *See id.*

TBH responds that Wilson should be estopped from relying on the above-quoted provision because Wilson failed to use reasonable diligence in urging BPA's approval of COP8, which TBH maintains was necessary due to Wilson's failure to provide reliable information about the subsurface conditions at tower 59/4. Dkt. #53, pp. 10-12. Wilson acknowledges that under the "prevention doctrine," a party may not rely on a condition to avoid its own obligations if that party improperly prevents the performance or occurrence of the condition. Dkt. #56, p. 7 (discussing *Northeast Drilling v. Inner Space Servs., Inc.*, 243 F.3d 25, 40 (1st Cir. 2001), one of the cases cited by TBH in support of its argument). However, Wilson maintains BPA denied COP8 "not because of Wilson's or Ryno's conduct," but because of TBH's actions, *id.*, pp. 7-8, which again raises the factual issue of fault underlying COP8.

The court finds genuine issues of material fact exist with regard to (1) what contractual language controlled TBH's work at tower 59/4; (2) the reasons for the extra work underlying COP8; and (3) if the jury determines the additional work was due to Wilson's actions, rather than TBH's actions, then whether Wilson properly attempted to enforce TBH's right to additional payment for the work, as contemplated by the above-quoted language of the Sub-contract, or alternatively whether Wilson is estopped by its

21 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1  actions from relying on the above provision of the Subcontract.
2  For these reasons, Wilson's motion for summary judgment as to COP8
3  is **denied.**

*Change Orders 14 & 15*

6      Wilson next moves for summary judgment regarding TBH's claim
7  for payment under Change Orders 14 and 15 (COP14 and CO15). Before
8  construction started on Phase II of the Project, BPA made two
9  changes to the original plans. First, BPA eliminated rock footings
10 in favor of plate footings. Second, BPA reduced the length of some
11 of the concrete shaft footings. BPA then asked Wilson and TBH to
12 arrive at an agreed-upon price for those changes. *See* Dkt. #46,
13 p. 4; Dkt. #47, Streetman Decl., ¶ 6. At the time, the only
14 geotechnical information available to TBH was the Geotechnical
15 Reconnaissance of the surface conditions that had been provided at
16 the time of the initial bid. TBH had no geotechnical information
17 regarding the subsurface conditions at the locations where the
18 footings would be installed. *Id.* Dkt. #55, Tapio Decl., ¶ 9.

19     On December 18, 2008, TBH sent a letter to Wilson discussing
20 the changes. TBH identified "three significant issues" arising
21 from the changes, and analyzed how each of them would affect TBH's
22 initial bid price. *See* Dkt. #55-2. TBH noted that its analysis
23 was ongoing, and the actual final cost of the changes could not be
24 ascertained until final measurements and subsurface conditions were
25 available. *Id.* According to Wilson, TBH ultimately "set a unit
26 price of $2,541 for each plate footing to be used in lieu of rock
27 footings," and a price per lineal foot for concrete shaft footings,
28 depending on whether the drilling was through rock or soil. Dkt.

22 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1  #46, p. 4 (citing Dkt. #47-3, TBH "Proposal for Equitable
2  Adjustment to Contract Price"). Based on Wilson's understanding of
3  TBH's price proposal, Wilson submitted a contract change request to
4  BPA on January 24, 2010. *See* Dkt. #47-4. BPA accepted the change
5  (with some changes not relevant here). *See* Dkt. #47, Streetman
6  Decl., ¶ 9.

7       To evidence the contract change, BPA and Wilson executed a
8  change order known as CCR15B, and Wilson and TBH executed a change
9  order known as COP1. *See* Dkt. #53, p. 5. Wilson claims it paid
10 TBH "in full at the agreed-upon unit price for each plate footing
11 and the agreed upon lineal foot price for the concrete shaft
12 footings." Dkt. #46, p. 4; Dkt. #47, Streetman Decl., ¶ 4. TBH,
13 however, claims COP1/CCR15B "is an unrelated issue to TBH's claims
14 under COP14 and 15." Dkt. #55, Tapio Decl., ¶ 10. Specifically,
15 Tapio claims his deposition testimony did not "establish unit
16 prices for work at towers where conditions were not as represented.
17 COP1/CCR15B did not include prices for unknown conditions." *Id.*
18

19 *Change Order 14 (COP14)*

20      Regarding COP14, TBH argues it is entitled to an equitable
21 adjustment under the terms of "BPA's Purchasing Instructions Part
22 14 and 24 and the January 2009 Master Agreement entitling subcon-
23 tractors to equitable adjustment when the estimated quantity [of
24 materials required for the job] varies significantly." *Id.*, ¶ 11.
25 According to TBH, BPA's estimate of the lineal feet of drilled
26 shafts varied by 35% from what TBH actually incurred. *Id.* Neither
27 party has provided the court with Part 24 of BPA's Purchasing
28 Instructions, upon which TBH partially bases its claim for an

1  equitable adjustment in COP14.  *See* Dkt. #55, ¶ 11.  Wilson has
2  provided the relevant portion of Part 14, which provides as
3  follows:

4          Clause 14-6 Variation in Estimated Quantity -
           Service and Construction Contracts. (Sep 98)
5          (BPI 14.6.2.1)

6          If the quantity of a unit-priced item in this
           contract is an estimated quantity and the
7          actual quantity of the item varies more than
           ___ (usually 10% for service contracts and 25%
8          for construction contracts) from the estimated
           quantity, an equitable adjustment in the unit
9          price of units performed outside of the
           established range shall be made at the request
10         of either party, if the variation in quantity
           alters the cost of the performance of the
11         work.

12  Dkt. #57-1, pp. 18-19.

13      Wilson notes TBH indicated in its December 18, 2009, letter to
14  Wilson that the lineal feet of drilled shafts due to BPA's changes
15  would result in a decrease of over 30%, and TBH would not know the
16  actual cost of this variance until after actual drilling.  Dkt.
17  #56, p. 14; *see* Dkt. #55-2.  Wilson indicates TBH was required to
18  submit as-built reports to document the actual depths of the shafts
19  TBH drilled, and "the amount of rock versus soil encountered by
20  [TBH] in drilling each shaft." Dkt. #58, Streetman Suppl. Decl.,
21  ¶ 4.  BPA agreed to adjust the contract payment for drilling after
22  all shafts were installed by comparing "the total [lineal feet] of
23  soil and rock drilling for each diameter of shaft" with "the
24  estimated quantities provided in the original Schedule of Prices."
25  Dkt. #58-1, p. 1, E-mail dated 12/15/09 from Kerry B. Cook to David
26  M. Hesse.  According to Wilson, TBH did, in fact, submit as-built
27  reports; "Wilson and BPA accepted [TBH's] representations provided
28  in the 'as builts'"; and TBH was paid on the basis of its as-built

24 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1  reports.  Dkt. #56, pp. 14-15; Dkt. #58, Streetman Suppl. Decl.,

2  ¶4.  Wilson asserts TBH's as-builts identified the amount of soil

3  and rock drilled, which Wilson states "was critical because [TBH]

4  . . . was paid significantly more for drilling in rock as opposed

5  to soil."  Dkt. #56, p. 14.  Wilson argues that if TBH encountered

6  any "unknown conditions," TBH would have documented those condi-

7  tions in its as-built reports.  *Id.*, pp. 14-15.

8      TBH does not dispute Wilson's representation that it was paid

9  based on the as-builts TBH submitted.  Although not entirely clear,

10 it appears that in COP14, TBH is requesting an equitable adjustment

11 *in addition to* what it was paid based on its as-builts.  The

12 evidence currently before the court is insufficient to determine

13 whether TBH is entitled to such an equitable adjustment.  In

14 particular, the record before the court does not contain Part 24 of

15 BPA's Purchasing Instructions, the portion of the Master Agreement

16 upon which TBH bases its argument, or citations by Wilson to any

17 portion of the contract documents indicating TBH *would not* be

18 entitled to the equitable adjustment described in Part 14 of the

19 Purchasing Instructions, despite having been paid in full for the

20 work shown in TBH's as-builts.

21     The court finds genuine issues of material fact exist with

22 regard to the merits[2] of TBH's claim regarding COP14 that the jury

23 will have to resolve.  Accordingly, Wilson's motion for summary

24 judgment on the merits as to COP14 is **denied.**

25 */ / /*

26 */ / /*

27 _____

28      [2]Wilson also asserts a timeliness challenge to TBH's claims
   regarding COP14 and COP15, which is discussed separately below.

25 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

***Change Order 15 (CO15)***

Turning to CO15, TBH submitted this change request due to additional costs it claims it incurred during excavation.  In a letter to Streetman dated January 14, 2011, Tapio stated, "For all plate footing types TBH estimated the cost of excavation based on either encountering soil or well blasted rock.  Because of the fact that well over half the sites were indicated by BPA as not anticipating rock and the relatively shallow depths of excavation TBH believed those assumptions were correct."  Dkt. #47-3, p. 1.  However, TBH originally bid 30 towers as rock footings that later were changed to plate footings.  TBH indicated its earlier bid "did not adequately address . . . the increased risk of the added quantity of rock excavation.  Comparing the neat line structural excavation between the as bid distribution of plates, bipods and rock anchors with the anticipated final quantities . . . resulted in an increase of 2,252 neat [cubic yards] of exc[avation]."  *Id.*, pp. 1-2.  According to TBH, BPA originally indicated half the sites were free of rock, but TBH encountered "site conditions that were different than what was represented in Ryno's data and the Geotechnical Reconnaissance."  Dkt. #55, Tapio Decl., ¶ 14.  TBH submitted a request for equitable adjustment in the amount of $13,512 for the additional structure excavation.  Dkt. #47-3, p. 2.

TBH argues it is entitled to the equitable adjustments requested in COP14 and COP15 because it relied on Wilson's representations regarding how the Project would proceed.  According to Tapio, Wilson represented "that it had addressed the limitations of the Geotechnical Reconnaissance with BPA at time of bid," leading TBH to believe the Project would continue forward as "a

26 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1  collaborative effort from Wilson including equitable adjustments

2  for unknown conditions." Dkt. #55, Tapio Decl., ¶¶ 18 & 19.

3  According to Tapio, Wilson represented that:

4           a.   Ryno would provide depth to rock data;
         b.   Ryno would blast the rock to such an
5              extent that TBH would encounter highly
               fragmented rock;
6           c.   Ryno's end product would allow TBH to
               excavate with conventional backhoe equip-
7              ment as opposed to grinding on hard rock;
               and,
8           d.   BPA and Wilson intended to work together
               with TBH in a collaborative and equitable
9              manner to resolve unknown geotechnical
               issues in light of the lack of a
10             geotechnical field study.

11  *Id.*, ¶ 18.  TBH asserts that Wilson's representations were

12  consistent with Wilson's agreement with BPA.  In responding to

13  BPA's questions regarding Wilson's bid proposal, Wilson clarified

14  its statement, "Pricing based on Geotech exploration information

15  provided by BPA," as follows:

16           This statement simply means that no Geotech
           exploration has been performed by Wilson so
17           our pricing is based on the information
           provided by BPA.  The Geo-technical reconnais-
18           sance information is the sole source of rock
           identification and suspected locations pro-
19           vided by BPA.  Any other assumptions on rock
           being present or not present are risky and
20           unreliable for bidding purposes.  We did not
           bid a "worst case scenario" regarding this.
21           Should unforeseeable Geotechnical issues arise
           during construction, Wilson would expect that
22           a collaborative and equitable resolution would
           be achieved between BPA and Wilson.

23

24  Dkt. #55-10, p. 2.  TBH argues it "had been assured that the above

25  was part of the agreement between Wilson and BPA.  The lack of

26  competent and adequate information was understood."  Dkt. #55,

27  Tapio Decl., ¶ 20.  TBH maintains it proceeded with the expectation

28  that there would be equitable adjustments for increased costs if

27 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

the conditions actually encountered differed significantly from the parties' initial expectations based on the Geotechnical Survey.

Wilson argues, however, that at the time of TBH's initial bid, "it had possession of the drawings for each footing type . . . [that] showed the dimensions for both foundation types which informed [TBH] how much excavation was going to be required for rock footings and how much excavation was going to be required for plate footings. . . . The amount of excavation necessary for each rock footing and each plate footing did not change in advance of Phase II." Dkt. #56, p. 15.  When BPA made the change that eliminated all rock footings in favor of plate footings, TBH considered the cost and timing impacts of the change, and set forth its position on those matters in the December 18, 2009, letter. *Id.*, pp. 15-16.  Once TBH completed its field reconnaissance, TBH sent a letter to Wilson dated January 15, 2010, setting forth TBH's proposal for additional work based on the elimination of the rock footings.  In the letter, TBH set out a table of locations where BPA had changed the specs from rock footing to plate footing, and TBH indicated it would "propose an added cost per footing for each of [those] cases." Dkt. #47-3, p. 2.

According to Wilson, "Three days later, [TBH] sent an email proposing a price of $2,541 for each plate footing, and $1,937 for each rock footing. . . . [TBH] also noted that if no rock footings were installed, the BPA change would net [TBH] an additional $146,000." Dkt. #56, p. 16 (citing Dkt. #58, Suppl. Streetman Decl., ¶ 2 & Ex. 1).  The e-mail string cited by Wilson does not contain any proposal from TBH regarding pricing for the footings. *See* Dkt. #58-1, pp. 1-3.  However, Wilson's representation cor-

28 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

responds with TBH's letter concerning COP15, in which TBH notes its original proposal was for "Rock Footings (grouted) = $1,937/each) and "Pressed Plate Footings = $2,541/each." Dkt. #47-3, p. 1.  In the cited e-mail string, Kerry Cook explained, "All holes will be logged and the depths of soil and rock drilling will be tabulated for each shaft diameter (measured from ground surface to design shaft tip).  After all shafts are installed, the total [lineal feet] of soil and rock drilling for each diameter of shaft will be compared to the estimated quantities provided in the original Schedule of Prices.  Contract payment will be adjusted where quantities differ from the estimated quantities." Dkt. #58-1, p. 1.  Thus, it appears BPA contemplated receipt of a request for equitable adjustment if the quantities differed from the initial estimate.

Wilson states TBH "noted that if no rock footings were installed, the BPA change would net plaintiff an additional $146,000." Dkt. #56, p. 16 (again citing the e-mail string, which does not contain this representation by TBH).  Wilson goes on to state, "BPA accepted the unit price change, no rock footings were ever installed, and [TBH] was paid in full for those unit priced changes." *Id.*  According to Wilson, TBH's additional cost for excavation "was already accounted for in the additional $146,000 [TBH] earned for installing plate footings rather than rock footings." *Id.*, p. 17.  Unfortunately, the court is unable to reach this conclusion based on the evidence the parties have submitted.  The evidence appears to be in some conflict on this issue, with Cook's e-mail contemplating the possibility of a change order based on actual conditions encountered, and Wilson stating TBH was already paid for the extra work.

29 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1    The court finds a genuine factual issue exists with regard to

2 the merits[3] of TBH's claim regarding COP15 that will have to

3 resolved by the jury at trial.    Therefore, Wilson's motion for

4 summary judgment on the merits as to COP15 is **denied.**

5

6 ***Timeliness of COP14 and COP15***

7    Wilson further argues that, regardless of the merits of TBH's

8 request for payment in COP14 and COP15, TBH submitted those two

9 change orders too late.    Wilson relies on the language of the

10 Subcontract, which provides in pertinent part as follows:

> <u>Changes</u>.    Contractor may, by written order,
> make changes in the work to be performed by
> Subcontractor within the scope of work
> required by the Prime Contract or ordered by
> Owner.    Contractor ordinarily will not order
> changes unless they have been ordered by the
> Owner.    No changes shall be made in this
> Subcontract or the work except upon such
> written orders.    If such changes result in an
> increase or decrease in Subcontractor's costs
> or time, an equitable adjustment may be made
> in Subcontractor's compensation or time.    No
> claim for an adjustment shall be valid unless
> notice of claim and the claim are received by
> Contractor, supported by necessary documents,
> in advance of the time required by the Prime
> Contractor [sic] for submission of the claim
> or notice, so as to afford Contractor a rea-
> sonable opportunity for review before submis-
> sion to Owner.    No claim of Subcontractor
> arising from changes, breach of contract, or
> otherwise, shall be valid unless written
> notice of the claim is received (1) with
> respect to changes, within 10 days after
> receipt of the order changing the work, and
> (2) in other cases, within 10 days after
> Subcontractor has notice of the occurrence
> giving rise to the claim.

---

[3]*Id.*

30 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1  Dkt. #47-1, p. 4, Subcontract, ¶ 12.  Wilson claims the Prime
2  Contract set a "30 day time limit . . .for submission of the claim
3  or notice [to BPA]."  Dkt. #46, p. 10; Dkt. #56, pp. 21-22.  Wilson
4  cites paragraph 2 of the Declaration of David Streetman, and the
5  above-quoted language of the Subcontract, in support of its conten-
6  tion.  However, neither the Subcontract nor Streetman's declaration
7  specifies anything about a "30 day time limit" for Wilson to submit
8  change order requests to BPA.   Further, Wilson's representation
9  regarding a "30 day time limit" is meaningless outside the context
10 of the related provision of the Prime Contract.  The court cannot
11 determine from what point the 30 days was to be calculated; e.g.,
12 the date Wilson became aware of a condition requiring the change,
13 the date work was actually performed requiring a change, the date
14 the Subcontractor submitted its request for a change, or some other
15 date.

16     Similarly, the language of the Subcontract, itself, is con-
17 fusing.  The quoted provision simultaneously requires the Subcon-
18 tractor to submit a change request (1) sufficiently in advance of
19 Wilson's deadline for submission of change orders to BPA to allow
20 Wilson "a reasonable opportunity for review before submission to
21 [BPA]"; and (2) either within 10 days of receipt of an order
22 changing the work, or 10 days from the date the Subcontractor "has
23 notice of the occurrence giving rise to the claim."  If, as Wilson
24 suggests, the 30-day requirement meant "within 30 days after
25 receipt of the [change] order," Dkt. #56, p. 22, but if, for
26 example, TBH's work underlying the change order was not completed
27 until 90 days after issuance of the order, and if TBH could not
28 predict what type of subsurface conditions it would encounter until

31 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1  the actual work was complete, then it would be impossible for TBH
2  to comply with the terms of the Subcontract.   Furthermore, the
3  evidence currently before the court does not provide a chrono-
4  logical sequence of events that would allow the court to determine
5  whether either COP14 or COP15 was timely.

6     For these reasons, the court finds genuine issues of material
7  fact exist regarding the timeliness of COP14 and COP15 that will
8  have to be resolved by the jury at trial.   Therefore, Wilson's
9  motion for summary judgment on the basis that COP14 and COP15 were
10 untimely also is **denied.**

### Change Order 16 (COP16)

13    TBH's work on Phase I of the Project was mostly complete by
14 March 2010.  *See* Dkt. #48-1, p. 11, Tapio Depo. at 119.  However,
15 BPA did not yet have access to the rights-of-way for all of the
16 Phase II towers at that time.   It was TBH's understanding that
17 access to all rights-of-way would be available by June 1, 2010.
18 *See id.;* Dkt. #53, p. 16; Dkt. #46, p. 5.   TBH and other
19 subcontractors wanted to begin Phase II work on the sites that were
20 already available in order "to avoid the cost of demobilizing
21 workers and equipment and then remobilizing them three months
22 later."  Dkt. #46, p. 5 (citing Dkt. #47, Streetman Decl., p. 3,
23 ¶ 13; Dkt. #48-1, p. 11, Tapio Depo. at 119).  According to Wilson,
24 BPA agreed to allow the subcontractors to begin work on Phase II
25 early, but BPA indicated it would not accept any change orders
26 associated with sequencing changes that required the subcontractors
27 to "bounc[e] around from site to site on Phase 2," as a result of
28 the subcontractors beginning work before all rights-of-way were

32 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

available.  Dkt. #48-1, p. 11, Tapio Depo. at 119.  Wilson takes the position that BPA's restriction on sequencing-related change orders was applicable to all *sites* that were released for construction by June 1, 2010.  However, it is apparent from the evidence that TBH had a different understanding of the restriction. TBH takes the position that BPA's restriction on sequencing-related change orders was applicable to *resequencing orders* (i.e., schedule changes) issued prior to June 1, 2010.  *Compare* Dkt. #46, pp. 5-6, *with* Dkt. #53, pp. 16 & 17, *and* Dkt. #47-7, pp. 1-2 (letter dated January 14, 2011, from TBH to Wilson, discussing COP16).

TBH claims that for the eight sites listed in COP16, "sequencing was excessive and not anticipated; and, each of these schedule changes occurred after June 1, 2010."  Dkt. #53, p. 16. Wilson, on the other hand, argues "each of the eight specified tower sites had been released prior to June 1, 2010."  Dkt. #46, p. 5.  On June 6, 2011, Wilson notified TBH that its request for COP16 was denied, for two reasons: first, because BPA had "always asserted that no additional cost would be paid for having to mobilize from one site to another"; and second, because TBH's request for COP16 was untimely.  Dkt. #47-7, p. 8.

TBH claims it raised the issue of additional costs created by resequencing in its letter to Wilson dated August 5, 2010, and therefore it provided Wilson with timely notice that TBH would be seeking additional payment.  Dkt. #53, pp. 16-17; *see* Dkt. #55-5, pp. 2-3.  In the letter, TBH noted its "as-planned schedule [had] been delayed or re-sequenced" for the following events, among others:

33 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

> B.   June-July: Under blasted excavations, to date TBH estimates at least 9 days of production have been added to the as-planned durations for the subject footings.   TBH has presented preliminary costing of $110,000.
>
> C.   August 2010: Wilson re-sequenced 70/4 to 64/2, again to facilitate Wilson's work flow. TBH estimates that the relocation will add 2 work days duration to the as planned schedule. TBH estimates that the reimbursable cost for this move to be no more than the similar crew relocation at 18/1 >> 18/5 to accommodate the grape harvest ($12,300)[.]

Dkt. #55-5, pp. 2-3.  In TBH's request for COP16, it listed eight "specific changes to the sequence that added to TBH's cost unreasonably."   Seven of the eight items contain a date and a tower location, to-wit: "6/17/2010 @ 44/5"; "7/7/2010 @ 43/4"; "8/17/2010 @ 70/4"; 9/24/2010 @ 64/2"; "10/1/2010 @ 65/3"; "10/14/2010 @ 66/4"; and "10/22 @ 70/5."  Dkt. #47-7, p. 2.   The eighth listing contains only the date "8/25/2010," with no tower location.  *Id.* TBH indicated these "added costs relate only to the increment of time added by the change to the sequence that would have been avoided if the work flow had not been interrupted."  TBH acknowledged it was reasonable to expect some added costs, and therefore, TBH proposed to absorb 50% of the added costs, ultimately asking for a change order in the amount of $37,000.  *Id.,* p. 3.

On the merits of COP16, once again, the record before the court is insufficient to find an absence of disputed material facts.  Besides the parties' different interpretations of BPA's limitation on change orders related to sequencing (i.e., whether the limitation related to all locations released for construction by June 1, 2010, or alternatively, related to all resequencing orders issued prior to June 1, 2010), the evidence also is not

1   clear as to the reason(s) for resequencing on the eight occasions
2   cited in TBH's change request.  In the letter, TBH appears to be
3   claiming the resequencing at issue was due, at least in part, to
4   Wilson's actions or for Wilson's benefit, rather than being related
5   to the parties' agreement to begin early construction on Phase II.

6      On the timing issue, the court again is faced with a lack of
7   evidence regarding the provisions of the Prime Contract.  Noting
8   TBH completed its work on the eight sites at issue on October 22,
9   2010, Wilson again argues TBH failed to provide "all necessary
10   supporting documents within the 30 day time limit that Wilson had
11   for submitting claims to BPA.  Because of [TBH's] delay, by the
12   time Wilson received Change Order No. 16, it was already too late
13   for Wilson to submit the claim to BPA."  Dkt. #46, p. 11.  If the
14   30-day time limit is calculated from the date TBH completed the
15   work in question, then it would appear TBH's request for COP16 came
16   too late; however, as discussed above with regard to COP14 and
17   COP15, the record lacks sufficient evidence for the court to make
18   that determination.

19      Accordingly, the court finds genuine issues of material fact
20   exist regarding both the merits and the timeliness of COP16, and
21   Wilson's motion for summary judgment as to COP16 is, therefore,
22   **denied.**

23

24                                ***Quantum Meruit***

25      In TBH's Complaint, it makes the following allegations, among
26   others: (a) TBH and Wilson entered into the Subcontract for TBH's

27

28

35 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1 work on Phase II of the Project[4]; (b) TBH performed its obligations

2 under the Subcontract; and (c) Wilson failed to pay TBH all sums

3 owed for TBH's work on Phase II of the Project. Dkt. #1, ¶¶ 8, 9,

4 10.   TBH asserts three claims for relief - a Miller Act claim

5 (First Claim for Relief), a standard breach of contract claim

6 (Second Claim for Relief), and a *quantum meruit* claim (Third Claim

7 for Relief).   Wilson moves for summary judgment on TBH's Third

8 Claim for Relief, the *quantum meruit* claim.   In that claim, TBH

9 further alleges the following:

> 18.   The labor and materials provided by [TBH] were provided at the request of [Wilson] and for [Wilson's] benefit.   [Wilson] has received and now retains the benefit of [TBH's] labor and materials.
>
> 19.   The amount, type, and quantity of labor and materials provided by [TBH] were reasonable.
>
> 20.   [Wilson] has not paid the sums due and owing or any part thereof and would be unjustly enriched if allowed to retain the benefit of [TBH's] labor and materials.

18 Dkt. #1, ¶¶ 18-20.

19    Wilson argues that when a plaintiff pleads the existence of a

20 contract, and incorporates it into the Complaint, and the defendant

21 admits the existence of the contract in its Answer, "'the action

22 [becomes] one in contract' rendering a *quantum meruit* claim 'no

23 longer relevant to the law suit.'"   Dkt. #56, p. 26 (quoting

24 *Kashmir Corp. v. Patterson*, 43 Or. App. 45, 48-49, 602 P.2d 294,

25 296 (1979)); Dkt. #46, pp. 11-12.   TBH responds that under Oregon

---

27    [4]TBH states a copy of the Subcontract for Phase II work is
28 attached to the Complaint as Exhibit B; however, no exhibits were
filed with the Complaint. *See* Dkt. #1.

36 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

law, when one party's performance is retarded or made substantially more onerous by the other party, then the aggrieved party can recover under a claim for *quantum meruit*. Dkt. #53, p. 17 (citing *Portland ex rel. Donohue & Fleskes Corp. v. Hoffman Constr. Co.*, 286 Or. 789, 796-98, 596 P.2d 1305, 1310-11 (1979); *Hayden v. City of Astoria*, 74 Or. 525, 145 P. 1072 (1915); *Hayden v. City of Astoria*, 84 Or. 205, 164 P. 729 (1917))). TBH argues Wilson's protocol on Phase II of the Project, which required TBH to proceed without the benefit of a geotechnical field study indicating the true nature of the subsurface conditions, retarded TBH's performance, allowing it to recover damages under a *quantum meruit* theory. Dkt. #53, p. 17. Wilson agrees TBH has accurately stated the law, but argues the principle upon which TBH relies is irrelevant in this case, where TBH pleaded and incorporated the Subcontract in the Complaint, and Wilson admitted those allegations. Wilson maintains *Kashmir*, the more recent case, is dispositive of TBH*'s quantum meruit* claim. Dkt. #56, p. 26.

In *Kashmir Corp. v. Patterson*, 43 Or. App. 45, 602 P.2d 294 (1979), the Oregon Court of Appeals explained the nature of a *quantum meruit* claim:

> *Quantum meruit* is a form of restitution where the plaintiff has performed services for defendant and seeks to recover their fair value. The law, in appropriate situations, will imply a quasi-contract. It is not consensual. It is not a contract. It is a remedial device which the law affords to accomplish justice and prevent unjust enrichment. . . . *Quantum meruit* presupposes that no enforceable contract exists.

*Kashmir Corp.*, 43 Or. App. at 48-49, 602 P.2d at 296 (citing *Derenco v. Benjamin Franklin Fed. S&L*, 281 Or. 533, 557, 577 P.2d

477, 491 (1978), in turn citing Dobbs, *Remedies* § 4.2 at 235 (1973)); *see Hahn v. Oregon Physician's Serv.*, 786 F.2d 1353, 1355 (9th Cir. 1985) ("'The purpose of *quantum meruit* is to prevent unjust enrichment at the expense of another.") (quoting *Shroeder v. Schaefer*, 258 Or. 444, 466, 483 P.2d 818, 820 (1971)).

A party is entitled to plead *quantum meruit* in the alternative, as a stop-gap measure in the event a contract, or the relevant portion of a contract, is held invalid.  Indeed, "the use of a *quantum meruit* claim as an alternative to a breach of contract claim is so common that it is not only unremarkable but something that is expected." *Mount Hood Comm. Coll. v. Federal Ins. Co.*, 199 Or. App. 146, 158, 111 P.3d 752, 758-59 (2005).  However, "the two theories are mutually exclusive: 'It is well established that there cannot be a valid, legally enforceable contract and an implied contract covering the same conduct.'"  *Ken Hood Constr. Co. v. Pacific Coast Constr., Inc.*, 203 Or. App. 768, 772, 126 P.3d 1254, 1256 (2006) (quoting *Mount Hood Comm. Coll., supra*).  "[I]f the parties have a valid contract, any remedies for breach flow from that contract, and a party cannot recover in *quantum meruit* for matters covered by the contract." *Id.* (citing *L.E. Morris Elec. v. Hyundai Semiconductor*, 203 Or. App. 54, 125 P.3d 1 (2005) "('When *quantum meruit* and contract claims are pleaded in the alternative, the *quantum meruit* claim becomes relevant only if the contract does not address the services for which recovery in *quantum meruit* is sought.')").  Oregon law is clear that "a party cannot recover in *quantum meruit* for matters covered by a valid contract." *Calhoun v. Bennett*, 236 Or. App. 206, 208 n.1, 236 P.3d 745, 746 n.1 (citing *Ken Hood Constr., supra*).

1    Nevertheless, Oregon jurisprudence has carved out an exception
2    to the general rules discussed above, addressing exactly the type
3    of claim TBH brings here.  In *City of Portland ex rel. Donohue &*
4    *Fleskes Corp. v. Hoffman Construction Co.*, 286 Or. 789, 596 P.2d
5    1305 (1979), the plaintiff ("Donohue") was a subcontractor hired by
6    the defendant ("Hoffman") to perform certain work on a sewage
7    treatment facility project in the City of Portland.  Donohue
8    claimed, among other things, that Hoffman had breached the parties'
9    contract in ways that obstructed Donohue's work, and greatly
10   increased Donohue's costs.  Donohue also alleged wrongful termi-
11   nation of the contract.  Hoffman counterclaimed for expenses
12   resulting from Donohue's alleged breach of the contract.  A jury
13   verdict was entered in Donohue's favor, and Hoffman appealed.

14   The *Donohue* court described the underlying facts of the case
15   as follows:

16           The first task in the project, which was
17       Hoffman's responsibility, was to dewater the
         swampy building site.  Hoffman ran into
18       unexpected difficulties in dewatering, which
         caused six months' delay in the project.  The
19       mud on the site was a persistent problem.  In
         addition to the dewatering difficulties, there
20       was evidence that Hoffman failed to provide a
         sufficient schedule for doing the work; failed
21       to coordinate the work of the various
         subcontractors; failed to provide adequate
22       working conditions for Donohue; and actively
         interfered with Donohue's attempts to do its
23       work.  There was contrary evidence that many
         of Donohue's problems were the result of
24       Donohue's own failure to do its job in a
         workmanlike manner.  The disputes between the
25       parties finally led Hoffman to terminate the
         subcontract[.]

26   *Donohue*, 286 Or. at 792, 596 P.2d at 1308.

27   The *Donohue* court discussed in some detail the "law in Oregon
28   on *quantum meruit* recovery by a party whose performance has been

39 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

made substantially more onerous by the breaches of the other party[.]" *Id.*, 286 Or. at 795, 596 P.2d at 1310. The court noted its previous decisions had established two rules for *quantum meruit* recovery when a contract exists. First, when a contract is "'deviated from in material particulars,' . . . the contract [can] be treated as abandoned, at least to some extent, and a new contract for the reasonable value of the services implied." *Id.*, 286 Or. at 796, 596 P.2d at 1310 (quoting *Hayden v. City of Astoria*, 74 Or. 525, 530-31, 145 P. 1072, 1073 (1915)). "The other rule of recovery in *Hayden*, was that when an owner is obligated by the contract to render a performance, he must render it 'in such a way as not to retard the contractor; and, if through the act or omission of the owner under such circumstances the work is delayed in such a way as to make performance impossible, the contractor can recover upon the *Quantum meruit*. . . .'" *Id.* (citing *Hayden*, 74 Or. at 533, 145 P. at 1074).

In *McDonald v. Supple*, 96 Or. 486, 190 P. 315 (1920), the court followed the reasoning of *Hayden*. There, Supple hired McDonald to build two dredge-hulls. Supple failed to supply materials and equipment at specified times pursuant to the contract. At trial, McDonald testified Supple's actions "'made the labor more burdensome and extended the same to two or three times the amount it would ordinarily have been, if the material had been delivered at the time and in the condition agreed upon.'" *Donohue*, 286 Or. at 797, 596 P.2d at 1311 (quoting *McDonald*, 96 Or. at 496-97, 190 P. at 318) (citing, *inter alia*, *Hayden*). Thus, the *McDonald* court held the plaintiff "'could properly recover upon a *Quantum meruit*. . . .'" *Id.*

40 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

1    The *Donohue* court concluded, "In summary, our cases recognize
2  that *quantum meruit* recovery is available to a contractor whose
3  performance has been made substantially more difficult and costly
4  by the other party's actions[.]" *Donohue*, 286 Or. at 786, 596 P.2d
5  at 1311.  Further, the court held no finding that the contract had
6  been abandoned was necessary before this type of *quantum meruit*
7  recovery could be had.  *Id.*

8    Although not relied upon frequently in later reported cases,
9  *Donohue* has not been modified or overruled by the Oregon courts.
10 In an unpublished decision, the Ninth Circuit Court of Appeals
11 recognized the viability of the *Donohue* holding, although finding
12 *Donohue* was not applicable in the case because the plaintiff had
13 failed to prove it was obstructed by the defendant, or that it
14 incurred unanticipated costs as a result of the defendant's
15 actions.  *American Income Development Corp. ("AID") v. Trus Joist*
16 *Corp.*, 884 F.2d 582 (Table), 1989 WL 102024 (9th Cir. Aug. 28,
17 1989).

18   The court finds TBH's *quantum meruit* claim is allowable under
19 Oregon law.  Accordingly, Wilson's motion for summary judgment on
20 that claim is **denied.**

21                          ***CONCLUSION***

22   For the reasons discussed above, Wilson's motion for partial
23 summary judgment (Dkt. #45) is **denied** on all grounds.

24   IT IS SO ORDERED.

25                        Dated this 8th day of August, 2013.

26

27                        /s/ Dennis J. Hubel
                          _____
28                        Dennis James Hubel
                          Unites States Magistrate Judge

41 - ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT